**LYNCH CARPENTER LLP**
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Telephone:   (619) 762-1900
Facsimile:   (858) 313-1850

*Attorneys for Plaintiff and
Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANNAH LACY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRANCESCA'S OPERATIONS, INC., a Delaware limited liability company, MAS ACQUISITIONS, LLC, a Delaware limited liability company, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 3:25-cv-01563-RSH-MMP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]**<br><br>Hon. Robert S. Huie<br><br>Complaint filed:   May 15, 2025<br>Removed:               June 18, 2025<br>Trial Date:            Not Yet Set |

Plaintiff Hannah Lacy ("Plaintiff") brings this action**,** on behalf of herself and all others similarly situated**,** against Francesca's Operations, Inc. ("Francesca's") and Mas Acquisitions, LLC ("Mas") and states:

### I.        NATURE OF ACTION

1.        "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous

California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Francesca's fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.    Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like the Defendants lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.    At all relevant times, Defendants have continually advertised false price discounts for merchandise sold throughout their Francesca's stores. In bringing this putative class action complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks monetary damages, restitution, and declaratory and injunctive relief from Defendants arising from their false discounting scheme on apparel, accessories, shoes, and other items sold in their Francesca's stores.

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

4.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendants, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.      The following example of a hypothetical DVD seller, which parallels Defendants' practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.      The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false referencing pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable,

---

[2] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

FIRST AMENDED CLASS ACTION COMPLAINT

but incorrect, *perceived value* of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD. Thus  the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.    Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continues to violate, California and federal law. Specifically, Defendants violated and continues to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (the "CLRA"); the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).  Plaintiff also asserts claims under the common law doctrines of unjust enrichment, fraudulent omission, and affirmative misrepresentation.

8.    Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more of Defendants' items advertised at a purported discount from a fictitious higher reference price from Francesca's stores. Plaintiff intends to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendants from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable damages, including actual, compensatory, benefit of the bargain, statutory, and punitive; equitable restitution; reasonable costs and attorneys' fees; and other appropriate relief in the amount by

FIRST AMENDED CLASS ACTION COMPLAINT

which Defendants were unjustly enriched as a result of their sales of merchandise offered a false discount.

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000, and at least some members of the proposed class (defined below) are citizens of states different from those of Defendants.

10.    The Southern District of California has personal jurisdiction over Defendants and is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Defendants conduct substantial business in this district and have sufficient minimum contacts with California, and/or otherwise intentionally avail themselves of the California market through the operation of their retail stores and e-commerce website within the State of California.

11.    Venue is further proper in this district under 28 U.S.C. § 1391(b) because Plaintiff resides in this judicial district, resided here during the time periods relevant to the conduct and claims alleged in this Complaint, and was injured in this district as a result of Defendants' unlawful conduct.

## III.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

13.    Defendants engage in a false and misleading reference price scheme in the marketing and selling of its Francesca's merchandise at its stores.

14.    Retailers like the Defendants can and do benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get *higher margins*, but also *increase sales*." Staelin et al., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to

FIRST AMENDED CLASS ACTION COMPLAINT

consumers can vary among different types of products.[3] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[4]

15.    Defendants' deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendants' deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[8]

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. LAW & ECON. 67, 68-69 (1973).

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78, no. 2 J. POL. ECON. 311, 311-12 (1970).

[5] Grewal & Compeau, *Comparative Price Advertising, supra* n.1, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4, no. 3 MKTG. SCI. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal & Compeau, *Comparative Price Advertising, supra* n.1, at 52.

[7] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no 3 J. OF CONSUMER PSYCH. 328 (2003).

[8] "To incorporate . . . the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the

16.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

---

perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting*, *supra* n.6, at 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, 19 no. 1 J. OF CONSUMER RSCH. 62, 68 (1992) [hereinafter Mayhew & Winer, *An Empirical Analysis*].

[10] Mayhew & Winer, *An Empirical Analysis*, *supra* n.10, at 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*. 62 J. OF MKTG. 46, 48 (1998) [hereinafter Grewal et al., *The Effects of Price-Comparison Advertising*].

[12] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting*, *supra* n.6, at 212.

[13] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*, 18 no.1 J. PUB. POL'Y & MKTG. 3, 7 (1999) [hereinafter Grewal & Compeau, *Pricing and public policy*].

[14] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14, no. 3 MKTG. SCI. G161 (1995); *see also* Jerry B.

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

17.     In Staelin, *Regulation of Fictitious Pricing*, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[16] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

18.     Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[17] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could

---

Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. OF APPLIED BUS. RSCH. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[15] Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[16] *See* Staelin et al.*, supra*, at 826 ("**It is now well accepted** that many consumers get **extra utility**, beyond that associated with consuming a product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

[17] Staelin et al.*, supra*, at 826 (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

FIRST AMENDED CLASS ACTION COMPLAINT

plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

19.    Consequently, retailers like Defendants, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendants' advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendants' product because, as Staelin *et al.* put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***." *Id.* at 835 (emphasis added).

**B.    Defendants Engage in a Fraudulent Price Discounting Scheme.**

20.    Francesca's is a specialty retailer of women's clothing and accessories. Many of the items sold at Francesca's, including its "Blue Rain" line, are private-label products manufactured exclusively for the brand and not sold in other retail stores.[18] As a result, Francesca's controls both the design and pricing of the vast majority of its inventory, including the so-called "original" prices listed on tags. For years, Defendants have engaged in a harmful fake discounting scheme by advertising its Francesca's merchandise at discounted "sale" prices in their stores located in California and across the United States. Defendants' scheme consists of marketing the "sale" prices as discounts from the former, "original" prices listed on the products' price tags. In most cases, the items are accompanied, either individually

---

[18] Francesca's operates several in-house brands, with its primary private label being Blue Rain, which offers a range of women's apparel including dresses, tops, and skirts. These items are designed and manufactured exclusively for Francesca's and are not available through other retailers. Another significant in-house brand is Franki by Francesca's, targeting the tween demographic with fashion-forward clothing and accessories. Additionally, in or around May 2023, Francesca's expanded its brand portfolio by acquiring Richer Poorer, a California-based lifestyle brand known for its sustainable wardrobe essentials like sweats, tees, and loungewear.

or in a small group, by a placard in the immediate vicinity advertising a certain percentage off ("__%") the former, "original" price. In a minority of other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price tag price.

21.    The percentage-off and whole-price reduction discount placard signs inside Francesca's stores are universally printed on black card stock with bold, white lettering advertising the fake discount. Defendants do *not* advertise or otherwise disclose the date on which any item was last offered for its "original" price.

22.    The photos below demonstrate Francesca's uniform storewide practice in place at all Francesca's stores.

 

FIRST AMENDED CLASS ACTION COMPLAINT







23.     As shown in the above photos, Defendants' "original" (a/k/a "ticket" or "price tag") prices are unadorned by any qualifying language that could arguably direct consumers to compare Defendants' reference price and purported discount to

FIRST AMENDED CLASS ACTION COMPLAINT

any *other* market outside of the particular Francesca's store where it is being advertised. This reasonable impression is reinforced by Defendants' pervasive use of percentage-off discounts and whole-price reduction (i.e., "Now …") signs, which denote limited-time discounts from ***former, "original" prices***.[19] Thus, Defendants' reference and "discount" price advertisements are not advertising a comparison to any other stores.

24.    What's more concerning is that Francesca's own price tags reveal that its purported discounts are illusory. In the upper-right corner of each tag, Francesca's prints a month—such as "July" in the last of the photo above—which, on information and belief, corresponds to the month the item was first placed on the sales floor. Plaintiff surmises that this internal coding allows Francesca's to track the release date of its products, yet Plaintiff's counsel's investigation reveals that these items are almost always advertised as being "on sale" from the moment they are introduced to market, demonstrating that the so-called original or "regular" prices were never the prevailing prices at which these items were offered to the public in good faith. Instead, the discount is baked into the launch, misleading consumers into believing they are receiving a bargain when they are not.

25.    Moreover, because Defendants' price tag reference prices convey a former, "original" price, they are not styled as "Compare At" or "Comparable Value" pricing representations, which could arguably put consumers on notice to look outside of that particular store to understand the value of the purported discount. In those schemes an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Accordingly, Plaintiffs are *not* required to "'assert evidence from

---

[19] *See Vizcarra v. Michaels Stores, Inc.*, 710 F. Supp. 3d 718, 725 (N.D. Cal. 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

FIRST AMENDED CLASS ACTION COMPLAINT

which a rational trier of fact could infer that the ***comparative*** reference price was inaccurate[,]'" because "th[at] situation ***only arises when the language of the advertisement implies a comparison to another retailer***." *Harris v. PFI W. Stores, Inc.*, No. SACV192521JVSADSX, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1085-86 (C.D. Cal. 2018) and *Horosny v. Burlington Coat Factory of California, LLC*, No. CV1505005SJOMRWX, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added). Thus, because consumers are not put on notice to check the Francesca's prices against any outside market, it is irrelevant to Defendants' liability whether their items are sold in other markets.

26.    Additionally, Plaintiff is informed and believes and thereon alleges that the merchandise offered for sale and sold in Francesca's stores in California and nationwide is the same. There is also no meaningful difference in Defendants' Francesca's inventory in California versus other states—the same products are sold at every store and the same fraudulent pricing scheme is deployed uniformly.

27.    Even if the Defendants did offer the Francesca's products at their full reference price (it does not), that offering would do little to legitimize Defendants' practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public ***on a regular basis for a reasonably substantial period of time***." 16 C.F.R. § 233.1(a) (emphasis added). Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendants also fail to do on *all* advertisements. Rather, the advertised reference prices on Francesca's merchandise are *not* the price at which Defendants regularly (or ever) sell, or expects

FIRST AMENDED CLASS ACTION COMPLAINT

to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

28.    In sum, Defendants' fake discount scheme is intended to (and does) increase Defendants' sales while depriving consumers of the benefit of their bargain and causing them to spend more money than the store items are actually worth—the price they could command in the absence of the fake discount.[20] This conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information and results in the illegal imposition of a price premium Francesca's store merchandise could not and would not otherwise command, which consumers, like Plaintiff, are duped into paying.

## C.    Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

29.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[21] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[22] Consumers are misled and incorrectly overvalue Defendants' products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendants to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference

---

[20] *See supra* n.17.

[21] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[22] Gotlieb & Fitzgerald, *An Investigation*, *supra* n.15, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id.* at 60.

FIRST AMENDED CLASS ACTION COMPLAINT

prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[23]

30.    Accordingly, all consumers who purchase Francesca's merchandise are harmed by Defendants' pricing scheme because its impact pervades the entire market for Francesca's merchandise. This is because, again, the artificially increased demand generated by Defendants' pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al.*, *supra*, at 835. Thus, all Francesca's shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendants' Francesca's merchandise. All consumers who purchase falsely discounted Francesca's products have overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

31.    To put it differently, the fake discount information presented by Defendants' falsely advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[24] on their purchases, which they would not

---

[23] Dhruv Grewal et al., *The Effects of Price-Comparison Advertising*, *supra* n.12, at 46.

[24] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'"); Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of

have otherwise gained but for Defendants' fake discounting scheme. Consumers' valuation of Francesca's merchandise therefore increases in the aggregate.

32.    Fundamental economics concepts and principles dictate that the harm caused by Defendants' scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[25] The aggregate demand curve for a product, including the Defendants', represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

33.    As a result, Defendants' pricing scheme impacts the market prices of its Francesca's products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Francesca's prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiffs and proposed Class (defined below) members thus suffered a common impact from Defendants' misconduct.

**D.    Investigation**

34.    Plaintiff's counsel has conducted a large-scale, multi-state, comprehensive investigation into Defendants' fake discounting scheme at their

---

a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[25] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis*. 3rd Edition. New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

FIRST AMENDED CLASS ACTION COMPLAINT

Francesca's stores. Plaintiff's counsel tracked items in Defendants' Francesca's stores in California from in or around February 2024 to August 2024. Attached as **Exhibit A** to this Complaint is a list of exemplary products tracked in California.

35.    From those efforts, Plaintiff is informed that Defendants' Francesca's pricing scheme (i.e., the manner in which the reference prices and purported discounts are conveyed to shoppers) appear uniform at *every* location, regardless of what state it is in or when the observation was made. The only thing that changed was the advertised discount and/or reference price on certain merchandise. Indeed, the vast majority of products observed appear to have remained "on sale" throughout the investigation,[26] "discounted" against a false reference price that has never been observed as the actual selling price. In other words, all items had price tags that were then perpetually "discounted" by in-store signage indicating a large percentage off ("__% Off") or whole-price reduction discount. Accordingly, Plaintiff is informed and believes and thereon alleges that Francesca's store merchandise is not regularly offered for sale at its full "original" price—and certainly not "on a regular basis for a reasonably substantial period of time," as required by 16 C.F.R. § 233.1. If the merchandise *is* offered at its full reference price it is usually *only* because it is being offered at such price in connection with a BOGO offer for a higher percentage-off of the "second" item the consumer purchases. In either event, the practice remains misleading.

36.    Thus, the investigation confirms that the "original" or "price tag" reference price of the items Plaintiff purchased are not the actual selling price of those items because they are rarely, if ever, offered at those prices in isolation, but rather continuously offered for sale at fake discount prices or fake BOGO offers. The investigation confirmed that this was a pervasive, uniform, and systematic

---

[26] As noted above, in addition to percentage-off discounts (%-off from "original" reference price on price tag), Defendants often employs a BOGO (buy-one-get-one) scheme in which, for example, if a customer buys one item at full price, they will get the next one for 50% off (or some other %-off). Plaintiff intends to test the viability of such a discounting scheme in this case.

practice at the Defendants' Francesca's stores, as hundreds, and perhaps thousands, of items remained continuously discounted throughout the investigation period, including those products purchased by Plaintiff.[27]

37. Products sold on Defendants' e-commerce website, https://francescas.com, and are also priced uniformly. That is, the products sold by the Defendants bear a substantially discounted sale price that appears next to the "crossed out" or "strikethrough" original price and purported percentage-off in

---

[27] Numerous false discount pricing cases brought in California federal district courts have held that, notwithstanding [FRCP] Rule 9(b), that plaintiffs are **not** required to perform or provide **any** specific details pertaining to pre-lawsuit investigations into false discounting practices in order to defeat a motion to dismiss. *See, e.g.*, *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 568 (9th Cir. 2017) ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos v. Columbia Sportswear Co.*, No. 15-CV-04543-YGR, 2016 WL 1730001, at *3–4 (N.D. Cal. May 2, 2016) (complaint lacking in any allegations related to pre-suit investigation of false discounting practice satisfied Rule 9(b); *Knapp*, 2016 WL 3268995, at *4 (allegations of "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying motion to dismiss where plaintiff pled existence of deceptive pricing scheme "on information and belief" only, without investigation); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Still, complaints containing pre-suit investigation allegations similar to Plaintiff's here have routinely been sustained over motion to dismiss challenges, in California federal courts as well as state courts which notably *do not* apply Federal Rule 9(b)'s heightened pleading standard for actions sounding in fraud. *See, e.g.*, *Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga v. Bellacor.com, Inc.*, No. 219CV10406MWFMRW, 2020 WL 5769080, at *1 (C.D. Cal. July 17, 2020); *Harris*, 2020 WL 3965022, at *1; *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint); *Schertzer v. Alpargatas USA Inc* (Super. Ct. San Diego, 37-2019- 00015352, Dkt. No 45).

parentheticals (e.g., "50% Off"). Plaintiff's counsel tracked numerous items offered for sale on Francescas.com from August 13, 2024 to March 7, 2025. A sample of the items tracked is attached as **Exhibit B**. The investigation included daily or near-daily monitoring of these items. In short, the investigation showed that the products were perpetually discounted and remained "on sale" for virtually the entire tracking period.

38.     Thus, the investigation confirmed that Defendants' merchandise are priced with phantom reference prices the vast majority of the time, whether it is at their brick-and-mortar storefronts or online. The discounting scheme is uniform and identically applied on all, or virtually all, of the products sold throughout Defendants' California brick-and-mortar stores.

39.     Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendants' possession.

## IV.    PARTIES

### Plaintiff Hannah Lacy

40.     Plaintiff resides and is a citizen of Oceanside, California. On or about July 21, 2024, Plaintiff went shopping for some new clothing at the Francesca's store located at the Shoppes at Carlsbad in Carlsbad, California. In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff purchased a pair of jeans that bore an "original" (reference) price of approximately $60 and a purported fixed price discount of $25, for an actual sales price of $35 (minus a 10% student/military/teacher discount).[28] Plaintiff paid an after-tax total of $33.95.

41.     During her time at the Francesca's store on July 21, 2024, Plaintiff browsed several items before deciding on what items to purchase. After reviewing

---

[28] Plaintiff notes that she does not allege that there was anything improper about the 10% military discount and that it has been worked out of any applicable preliminary damages calculations, described further below.

FIRST AMENDED CLASS ACTION COMPLAINT

the advertised reference and "sale" price for the above-described jeans, Plaintiff decided to purchase the items. During her time there on July 21, 2024, Plaintiff noticed numerous signs within the Francesca's store advertising various "__%"-off discounts on items throughout the store.

42.    Indeed, after observing the original price of the item and the accompanying sale price, Plaintiff believed she was receiving a significant discount on the item she had chosen. Her belief that the discounted prices on the items were limited and would not last was material and integral to her purchase decision. She would not have made the purchases were it not for the significant bargain she thought she was receiving. However, Plaintiff did not receive the benefit of her bargain and, in reality, paid more for the items than they were worth in the form of a premium as a result of the fake sale scheme.

43.    Plaintiff has therefore suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent false reference pricing scheme.

### Plaintiff's Economic Injury Is Readily Quantifiable

44.    Plaintiff has been injured and incurred quantifiable actual damages as a result of Defendants' fraudulent pricing scheme, which can be and has been preliminarily calculated through the use of regression analysis.

45.    Plaintiff overpaid for the products she purchased as described herein. And it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original belief that the products she purchased were discounted and, thus, that their value was significantly greater than the sale price for which she purchased them, Plaintiff, in actuality, paid an *inflated* price for all of the supposedly discounted products she purchased. In other words, both the reference prices and the actual selling prices of the items Plaintiff purchased were inflated, but for different reasons: the reference prices because Defendants intentionally fabricated them and the actual selling prices because if Defendants had not engaged in the false discounting scheme, then those items would not have

FIRST AMENDED CLASS ACTION COMPLAINT

commanded such high, i.e., *inflated*, prices. Thus, the items Plaintiff purchased were all worth less than the amounts she paid for them.

46.    Plaintiff was damaged in her purchases because Defendants' false reference price discounting scheme inflated the final selling price of the items she purchased, such that Defendants' false reference price discounting scheme caused Plaintiff to pay a price premium. Defendants' false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendants not engaged in a false reference pricing scheme. Plaintiff would not have purchased the merchandise, or would have paid less for it, but for Defendants' representations regarding the false reference prices and purported discounts of the merchandise. Plaintiff was misled into believing that she was receiving substantial savings on the purchase of Defendants' products, which was implied by the falsely advertised reference prices.

47.    Here, for purposes of investigation and determining a preliminary measure of damages, Plaintiff, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendants' product SKUs and pricing practices attached to each SKU. Plaintiff, through the use of sophisticated regression analysis, was able to determine the objective measure by which Plaintiff and Class members overpaid for the goods they purchased.[29]

48.    Reference guides on regression-based damages describe how "[p]ractitioners can use several tools to establish and measure relations among the

---

[29] Notably, if the "misrepresentation ... artificially inflate[s] the market price of a product, causing [Plaintiffs] to pay more for it than [they] otherwise would have— regardless of whether [they] even saw the misrepresentation," the plaintiffs were "harmed [ ] by a misrepresentation without necessarily having relied on it." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *10 (S.D.N.Y. Aug. 13, 2020). Under this "theory of causation … that the advertising and labeling practice allowed a price premium to be charged" is often known as a "market-price-based theory of causation." *Id.* at *11 (citation and internal quotation marks omitted). This theory, "unlike the promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

variables that affect revenues and costs, and thus establish the casual link … Regression analysis applies a statistical technique to develop an equation depicting the relation among variable and then uses that equation for prediction."[30] In this case, Plaintiff's consultants utilized regression analysis to estimate the relationship between Defendants' reference prices and Defendants' selling prices, after accounting for the other factors that influence Defendants' pricing, and used that equation to predict prices that would have occurred but for misconduct in this case. As explained below, the regression analysis relies on Defendants' data and measures how selling prices increase when the intensity of its misconduct is greater (i.e. a higher reference price leads to higher selling price, holding all else equal).

49.    Plaintiff's experts used the data collected during the investigation to analyze 97 products offered for sale within Defendants' Francesca's stores during the Class Period (defined below). The average selling price within this data sample was $42.85, whereas the average reference price was $53.19. Thus, on average, the reference price chosen by Defendants was $10.34 higher (or 24.1% higher) than the selling price.

50.    Plaintiff's experts used this data as input (among additional control variables affecting price, described below) to perform a regression model which allowed them to calculate the price premium paid by Plaintiff, and all similarly situated proposed Class members, for each product purchased. The regression model incorporates supply and demand factors through the use of *actual selling prices*, which are the net result of the competitive factors that influence Defendants' pricing. For example, the price of an item at issue in this case is a function of its component features (e.g., is the item a top, dress, or jacket? Is the item marketed towards women or men?). The net effect of the demand factors (e.g., consumer willingness to pay for an item based on its features) and supply factors (e.g., Defendants' production

---

[30] Roman L. Weil et al., *Litigation Services handbook: the role of the Financial Expert* Ch. 4, p. 25 (6th ed. 2017).

FIRST AMENDED CLASS ACTION COMPLAINT

costs) are captured within the product's attributes when actual selling prices are used in this type of regression analysis.

51.    While additional variables will be accounted for after more detailed data is provided by Defendants or elsewhere during discovery, ***this initial regression analysis already accounts for 11 variables that impact Defendant's pricing*** (including reference price). For example, the regression analysis accounts for broad product type (e.g., bottoms vs. tops vs. outerwear) and specific product type (e.g., tee shirt vs. blouse vs. pullover vs. button up).

52.    After accounting for these product characteristics, the regression finds a coefficient of 0.37. In other words, the regression finds that increasing the reference price by $1 results in an increase of 37¢ in the selling price of items at Francesca's stores.

53.    The corresponding regression equation is then used to predict selling prices if the reference price was reduced to the typical selling price of the item (i.e., lowering the reference price to remove the impact of the pricing misconduct). For example, as previously discussed, the preliminary data suggests that Defendants' reference prices were $10.34 higher (24.1% higher) than the actual sales prices, on average. When combined with the preliminary regression results described above, this $10.34 differential implies that selling prices were approximately $3.83 higher, on average, due to the false discounting scheme alleged in this case.[31] This average overcharge of $3.83 represents approximately 9.0% of the average purchase price within the data collected by Plaintiff.

54.    These results will be revised somewhat once Plaintiff receives additional pricing data (i.e., daily histories of reference and sale prices for many more SKUs during the Class Period), but even the data collected by Plaintiff's counsel demonstrates that Plaintiff and others similarly situated paid a price premium as a direct result of the false discounting scheme practiced universally at

---

[31] That is, $10.34 x 0.37 = $3.83.

Francesca's stores. Plaintiff will seek in-depth discovery of internal documents, digitally stored historic pricing data, and depositions of persons most knowledgeable about Defendants' practices to supplement this investigation, show common injury at class certification, and prove damages with reasonable certainty at trial.

55.    The table below shows the application of the preliminary regression coefficient (0.37) to the items purchased by Plaintiff and the resulting measure of injury.[32]

| Item | Delta (Δ) Between Reference and Sale Price | Coefficient (0.37) | Damages (Δ x 0.37) |
|------|-------------------------------------------|--------------------|--------------------|
| Jeans purchased by Plaintiff | $25.00[33] | 0.37 | $9.25 |

56.    The harm to Plaintiff and Class members (i.e., price premium) caused by Defendants' misconduct can also be objectively measured through the use of conjoint analysis supported by Defendants' historic pricing, sales, and other market data, which will also be pursued vigorously in discovery, to isolate the price premium associated with Defendants' false reference price and discounting scheme. Conjoint analysis is described as "a form of statistical analysis that firms use in market research to understand how customers value different components or features of their products or services … Conjoint analysis is typically conducted via a specialized survey that asks consumers to rank the importance of the specific features in question. Analyzing the results allows the [practitioner] to then assign a value to each one."[34] To explain further, conjoint analysis is a well-accepted survey-based technique in which survey participants select their most preferred product

---

[32] This exercise can be performed for every product Defendants have sold at Francesca's stores at a purported discount by multiplying the regression coefficient by that item's reference price/sales price differential. Once enough historical pricing and sales data is provided to Plaintiff's experts to perfect the regression coefficient, measuring the harm to each Class member will be a simple mechanical exercise.

[33] Again, Plaintiff notes that this delta does *not* include the 10% military discount Plaintiff received on top of the fixed $25 discount.

[34] https://online.hbs.edu/blog/post/what-is-conjoint-analysis.

FIRST AMENDED CLASS ACTION COMPLAINT

from a series of product options with different attributes (including price).[35] The researcher will then analyze consumers' trade-offs among products with different features using a statistical model that allows the researcher to estimate the influence of each product attribute and the willingness-to-pay ("WTP") for a particular product attribute. In other words, conjoint analysis can establish the extent to which consumer preferences (i.e., consumer demand, or WTP) change due to the alleged misconduct (i.e., false reference and discounting scheme) and, further, quantify its monetary impact on actual selling prices. After measuring the change in consumer preferences (and WTP) due to the alleged misconduct in this case, an overcharge is calculated by then incorporating *supply*-side behavior.

57.    As with hedonic regression, Plaintiff can put forth an expert-based conjoint analysis with and/or without an economic market simulation to account for supply side factors[36] that will likewise demonstrate the price premium paid on

---

[35] "The key characteristic of conjoint analysis is that respondents evaluate product profiles composed of multiple conjoined elements (attributes or features). Based on how respondents evaluate the combined elements (the product concepts), we deduce the preference scores that they might have assigned to individual components of the product that would have resulted in those overall evaluations" (Orme, B. "A Short History of Conjoint Analysis." Chapter 4 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Second Edition, Madison, WI: Research Publishers LLC, 2010, p. 29).

[36] An economic market simulation estimates market prices by fully incorporating the relevant supply and demand information to estimate the but-for market prices that would have been paid by consumers in the absence of the alleged misconduct. It is used to incorporate supply side factors into the but-for world in which consumers' WTP has adjusted due to the absence of the alleged misconduct. Market simulations often incorporate (and are calibrated to) real-world supply and demand market data on the Defendants' (and competitor's) products, prices, costs, market share, consumer decisions (*e.g.*, mixed logit coefficients from conjoint analysis), and the price elasticity of consumer demand. Indeed, a wide body of academic literature in the economics discipline describes combining the consumer demand side of the market with the supply side of the market to determine market equilibrium prices. For example, Steven Berry, et al., Automobile Prices in Market Equilibrium, 63 *Econometrica* 841 (1995); Aviv Nevo, A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, 9 *Journal of Economic and Management Strategy* 513-548 (2000); Steven Berry, et al., Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market, 112 *Journal of Political Economy* 68-105 (2004); Petrin, Amil, Quantifying the Benefits of New Products: The Case of the Minivan, 110 *Journal of Political Economy* 705–729 (2002); Greg Allenby, et al., Valuation of Patented Product Features, 57 The Journal of Law & Economics 629-663 (2014). Within the context

FIRST AMENDED CLASS ACTION COMPLAINT

products with inflated reference prices as compared to those without inflated reference prices. This approach will isolate the economic harm to Class members due solely to Defendants' misconduct and will demonstrate that otherwise identical products sold *without* reference prices ultimately cost less.

58.    Accordingly, objective measures demonstrate that Plaintiff overpaid for the Francesca's store merchandise she purchased. The difference between the actual sales price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendants' false discounting scheme—and the market sale price that the products would have commanded without Defendants' misconduct provides an objective measure by which Plaintiff was overcharged and injured by Defendants. The amount of inflation of the prices for Francesca's store merchandise Plaintiff purchased caused by Defendants' deception thus measures how much Plaintiff overpaid. As shown above, this amount can be quantified using regression analysis based on Defendants' historic pricing data and/or through conjoint analysis (with or without a market simulation). Plaintiff's allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 (1999). *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase") (emphasis added).

---

of consumer class action litigation, various courts have accepted damages models based on economic market simulations that incorporate the findings of a conjoint analysis with additional supply-side factors. *See, e.g., Wesley Won et al. v. General Motors, LLC*, No. 2:19-cv-11044 (DML) (DRG) (E.D. Mich., July 28, 2022); *Thomas Allegra et al. v. Luxottica Retail North America, d/b/a Lenscrafters*, No. 17 CV-5216 (PKC) (RLM) (E.D.N.Y., Dec. 13, 2021); *Riley Johannessohn, et al. v. Polaris Industries, Inc.*, No. 16-cv-03348 (NEB/LIB) (D. Minn., Mar. 31, 2020) ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world").

FIRST AMENDED CLASS ACTION COMPLAINT

### Plaintiff Has Standing for Injunctive Relief and Lack An Adequate Remedy at Law

59.    Plaintiff is also susceptible to the same harm reoccurring, and therefore require an injunction (i.e., Plaintiff lacks an adequate remedy at law), because she cannot be certain that Defendants will have corrected this deceptive pricing scheme, and she desires to shop at Defendants' Francesca's stores in the future because she likes the brand and the clothing styles offered. Further, due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Francesca's stores, Plaintiff will be unable to parse what prices are inflated and untrue, and what prices are not. Plaintiff simply does not have the resources to ensure that Defendants are complying with California and federal law with respect to their pricing, labeling, and/or advertising of Francesca's store merchandise.

60.    Further, because of the wide selection of merchandise available at Defendants' Francesca's stores, the sheer volume of products involved in Defendants' deceit (i.e., on information belief, virtually all of them), and the likelihood that Defendants may yet develop and market additional Francesca's merchandise items for sale, Plaintiff may again, by mistake, purchase a falsely discounted product at one of the Francesca's stores under the reasonable, but false, impression that Defendants had corrected the scheme and that its reference price advertisement represented a *bona fide* former price at which the item was previously offered for sale by Defendants. However, without a substantial, time-consuming, and costly investigation, Plaintiff will have no way of knowing whether Defendants have deceived her again.

61.    Absent an equitable injunction enjoining Defendants from continuing in the unlawful course of conduct alleged herein, Plaintiff, Class members, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendants' ongoing and deceptive conduct that cannot be remedied with monetary

damages. Accordingly, Plaintiff, Class members, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiff, as well as California consumers at large, the appropriate assurances.

62.    Additionally, Plaintiff presently lacks an adequate remedy at law because she has not yet developed the damages model necessary to determine whether actual damages will fully compensate the monetary harm suffered, or whether equitable restitution will be required to make Plaintiff whole. Legal damages are traditionally limited to actual out-of-pocket losses (reliance damages) or lost benefit of the bargain (expectancy damages), whereas equitable restitution focuses on restoring ill-gotten gains wrongfully obtained by the defendant from the plaintiff/class members. Critically, California law prohibits recovery of benefit-of-the-bargain damages in consumer deception cases but permits recovery of the same measure through *equitable relief*. *See* Cal. Civ. Code § 3343. For example, Plaintiff and other Class members may be entitled to recover the difference between the price paid and the value received—a measure unavailable at law but recoverable in equity. Until Plaintiff retains an expert and completes the necessary economic analysis, it remains uncertain whether legal damages will even be viable, let alone adequate. Accordingly, Plaintiff credibly alleges at this stage that no adequate legal remedy exists, satisfying the *Sonner* standard for pleading equitable relief.[37]

63.    Plaintiff also lacks an adequate remedy at law because her claims under the UCL "sweep[] more broadly than [those under] the CLRA." *See Allen v. Hylands, Inc.*, 773 F. App'x 870, 874 (9th Cir. 2019). Although Plaintiff's UCL

_____

[37] Decisions in numerous false discounting cases have accepted similar allegations where the defendant has challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g., Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021); *Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10.

claim under the "fraudulent" prong applies the same "reasonable consumer" standard as the CLRA, her claim under the "unfair" prong reaches substantially further. As alleged, Defendants' conduct may be deemed "unfair" where it offends established public policies favoring transparency in pricing or constitutes immoral, unethical, oppressive, or unscrupulous conduct that substantially injures consumers—harms not fully captured by the CLRA's remedial scheme. Because these broader injuries do not have an adequate legal remedy under the CLRA, and the UCL independently authorizes equitable relief to remediate such conduct, Plaintiff credibly alleges that legal damages are inadequate. Thus, Plaintiff properly plead parallel claims for legal damages and equitable restitution at this stage.

64.    Finaly, Plaintiff further lacks an adequate remedy at law because the UCL (an equitable cause of action) carries a statute of limitations of four years, while the CLRA (which can provide legal damages *and* equitable restitution) carries a shorter, three-year statute of limitations. Cal. Bus. & Prof. Code § 17208; Cal. Civ. Code § 1783. Thus, dismissal of Plaintiff's (equitable) UCL claims would wipe out an entire year's worth of monetary recovery for the Class.

**<u>Defendants</u>**

65.    Defendant Francesca's Operations, Inc. is a Delaware limited liability company with its principal executive offices in Houston, Texas. Plaintiff is informed and believes that Francesca's owns and operates Francesca's-branded retail stores in California and other states across the United States, and advertises, markets, distributes, and/or sells Francesca's-brand clothing and accessories to consumers in California and nationwide.

66.    Defendant Mas Acquisitions LLC is a Delaware limited liability company with its principal executive offices in Los Angeles, California. Plaintiff is informed and believes that, in or around 2024, Mas Acquisitions LLC acquired a controlling interest in Francesca's Operations, Inc. from a prior owner, Terramar

Capital LLC.[38] Mas Acquisitions is therefore responsible, in whole or in part, for the policies, practices, and conduct described in this Complaint.

67.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

68.    Defendants know that their reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California and federal law.

69.    Defendants fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices and former reference prices. Defendants concealed from consumers the true nature and quality of the products sold at its Francesca's stores.

70.    Defendants intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Francesca's products.

71.    At all relevant times, Defendants have been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

---

[38] Plaintiff is electing not to name Terramar Capital as a defendant in this action at this time. However, to the extent Mas Acquisitions LLC contends that Terramar bears any responsibility for the conduct alleged in this Complaint, Plaintiff would understand if Mas sought to bring Terramar into this action through permissive joinder or another appropriate procedural mechanism.

FIRST AMENDED CLASS ACTION COMPLAINT

## V.    CLASS ALLEGATIONS

71.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants:

> All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Francesca's store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more Class, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

72.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

73.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether, during the Class Periods, Defendants used false advertised reference prices on its Francesca's product labels and falsely advertised price discounts on merchandise sold in its outlet stores;

b.    whether Defendants ever offered items for sale or sold items at their advertised reference price;

c.    whether, during the Class Periods, the original price advertised by Defendants was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.    whether, during the Class Periods, any of the original prices advertised by Defendants were false or misleading;

e.    whether Defendants' purported sale prices advertised in its Francesca's stores reflected any actual discounts or savings;

f.    whether Defendants' purported percentage-off discounts advertised in its Francesca's stores reflected any actual discounts or savings;

g.    whether Defendants' alleged conduct constitutes violations of the laws asserted;

h.    whether Defendants' alleged conduct constitutes violations of federal and/or California pricing regulations;

i.    whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

j.    whether Plaintiff and Class members are entitled to damages and the proper measure of that loss; and

k.    whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparisons.

74.    ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

75.    ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer

FIRST AMENDED CLASS ACTION COMPLAINT

class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

76.    ***Superiority***: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

77.    All Class members, including Plaintiff, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, and advertising scheme, disseminated in a years-long campaign to consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendants' false advertising scheme when purchasing merchandise sold at Francesca's stores.

78.    Plaintiff is informed that Defendants keep extensive computerized records of their Francesca's customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email

and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

79.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

80.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

81.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

82.    The UCL imposes strict liability. Plaintiff and members of the proposed Class need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

83.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

84.    Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendants' acts and practices offended an

established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

85.    The harm emanating from this practice to Plaintiff and members of the proposed Class outweighs any utility it provides because Defendants' practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

86.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

87.    Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived Plaintiff and members of the Class and is highly likely to deceive members of the consuming public. Plaintiff and members of the Class relied on Defendants' fraudulent and deceptive representations regarding its false ticket prices for products sold by Defendants. These misrepresentations played a substantial role in Plaintiff's and members of the proposed Class's decisions to purchase products at a purportedly steep discount, and Plaintiff and members of the Class would not have purchased products without Defendants' misrepresentations.

***"Unlawful" Prong***

88.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

89.    Defendants' acts and practices alleged above constitute unlawful business acts or practices as the Defendants have violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under

the FTC, false former pricing schemes, like Defendants, are described as deceptive practices that would violate the FTCA:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

90. In addition, Defendants' acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

*No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement* or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

91. Defendants violate § 17501 because they advertise items, including the items that Plaintiff purchased and are described herein, with a former price that

greatly exceeds the prevailing market price of those items. For the most part, Defendants advertise on their price tags a reference price that is unadorned by any qualifying language (e.g., "Compare At") which could arguably put consumers on notice to review prices outside of the Francesca's store.

92.    In so doing, Defendants reasonably convey to consumers that these reference prices represent their *own* former price for that same merchandise. *See supra* n.20 (citing *Vizcarra*, 710 F. Supp. 3d at 725). Accordingly, the "prevailing" market price of those items can be measured exclusively by reference to Defendants' own historical sales data. *See Harris*, 2020 WL 3965022, at *4 (the need for allegations pertaining to a false discounting plaintiff's counsel's investigation of outside market "*only arises when the language of the advertisement <u>implies a comparison to another retailer</u>*.") (emphasis added); *see* ¶ 23.

93.    Thus, Defendants' internal sales data need only be reviewed to ascertain the "prevailing" market prices for the products at issue in this case. *See People v. Super. Ct. (J.C. Penney Corp., Inc.)*, 34 Cal. App. 5th 376, 410-13 (2019) (the "prevailing market price" is the most "common," "predominant," or "most widely occurring" price at which items are sold) (citing authorities).

94.    As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

95.    As detailed herein, and for the same reason that Defendants' acts and practices violate the FTCA and the FAL, they also violate the CLRA, thus establishing another "unlawful" act in violation of the UCL.

96.    Defendants' practices, as set forth above, misled Plaintiff, the Class, and the public in the past and will continue to mislead them in the future.

Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

97.    Defendants' violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff, members of the Class, and the public who, if Defendants' false pricing scheme is permitted to continue, will continue to be deceived into purchasing products based on illegal price comparisons. These false price comparisons lead to artificial and increased demand which, in turn, leads to higher prices and financial harm for consumers like Plaintiff and the members of the Class as described herein. Because of the surreptitious nature of Defendants' deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendant's practice.

98.    Pursuant to Bus. & Prof. Code § 17203, Plaintiff and members of the Class are entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff and the Class of all Defendant's revenues wrongfully obtained from them as a result of Defendants' unfair competition, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION

**Violation of California's False Advertising Law ("FAL")**
**CAL. BUS. & PROF. CODE §§ 17500, *et seq.***

99.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

100.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants for violations of California's FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

101.    Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services,

professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

102.   The FAL further provides:

no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

Cal Bus. & Prof. Code § 17501.

103.   Defendants' routine of advertising discounted prices from false ticket prices, which are not and never have been the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold by Defendants are worth more than they actually are.

104.   As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendants' business, Plaintiff and members of the Class suffered economic injury.

105.   Plaintiff, on behalf of herself and the Class, requests that this Court order Defendants to restore this money to Plaintiff and the Class, and to enjoin

Defendants from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff, members of the Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

### THIRD CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, *et seq.***

106.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

107.   Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants for violations of the CLRA, Cal. Civ. Code § 1750, *et seq*.

108.   Plaintiff and each member of the Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendants' sale of products were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff and members of the Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

109.   Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of products sold at Defendants' Francesca's stores:

a)   advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

b)   making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

110.   Plaintiff and the Class are consumers who have suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendants' use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff therefore seeks an

order enjoining such methods, acts, or practices as well as any other relief the Court deems proper. Plaintiff additionally seeks costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

111.   On July 9, 2025, Plaintiff's counsel sent Defendants a CLRA notice letter, which complies in all respect with § 1782(a). The letter was sent via certified mail, return receipt requested, and advised Defendants that they were in violation of the CLRA and demanded Defendants cease and desist from such violations and make full restitution by refunding the monies unlawfully obtained from Plaintiff and consumers received therefrom. The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers. Upon Defendants' failure to fully rectify the wrongs described in this notice letter after 30 days following receipt, Plaintiff seeks all legal damages available under the CLRA.

## VII.   PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendants as follows:

A.   an order certifying the Class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

B.   awarding Plaintiff and members of the Class all actual, consequential, punitive, and statutory damages, as appropriate, including legal damages for Plaintiff's CLRA claim if and when Defendants fails to take appropriate actions in response to Plaintiff's CLRA notice letter pursuant to Cal. Civ. Code § 1782(a);

C.   awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiff and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

D.   awarding declaratory and injunctive relief as permitted by law or equity, including an order enjoining Defendants from continuing the unlawful

practices as set forth herein and retaining jurisdiction to monitor Defendants' compliance with permanent injunctive relief;

E.    ordering Defendants to engage in a corrective advertising campaign;

F.    awarding attorneys' fees and costs; and

G.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: July 9, 2025

**LYNCH CARPENTER LLP**

By:  */s/ Todd D. Carpenter*
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Telephone:  619.762.1910
Facsimile:   858.313.1850

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

FIRST AMENDED CLASS ACTION COMPLAINT